# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

KENNETH T. ADAMS,         )
         )
     **Plaintiff,**       )
         )
   **v.**         )     **No. 4:07CV1041 MLM**
         )
MICHAEL J. ASTRUE,       )
**Commissioner of Social Security,**   )
         )
     **Defendant.**     )

## MEMORANDUM OPINION

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue ("Defendant") denying the applications for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq., filed by Plaintiff Kenneth T. Adams ("Plaintiff"). Plaintiff has filed a brief in support of the Complaint. Doc. 20. Defendant has filed a brief in support of the Answer. Doc. 22. The parties consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 14.

## I.
## PROCEDURAL HISTORY

On May 4, 2005, Plaintiff applied for disability benefits. Tr. 53-57, 110-112. Plaintiff's applications were initially denied. Tr. 48-52, 103-107, 135-39. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on July 6, 2006, before ALJ James E.

Seiler.[1] Tr. 22-45. In a decision dated September 11, 2006, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. Tr. 14-21. On March 20, 2007, the Appeals Council denied review of the ALJ's decision. Tr. 3-10. As such, the opinion of the ALJ stands as the final decision of the Commissioner.

## II.
## TESTIMONY BEFORE THE ALJ

Plaintiff testified that at the time of the hearing he was 44 years old; that he did not smoke or drink alcohol; that he was six feet and two inches tall; that he weighed 480 pounds; and that five years prior to the hearing he weighed between 366 and 370 pounds. Plaintiff testified that his weight gain was caused by "depression, not having the proper eating arrangements, not receiving the nutrients that I need due to the fact of the accommodations of where I live." Tr. 27-28, 44.

Plaintiff also testified that he was diagnosed with diabetes in 2003; that he uses a cane; that the cane was prescribed by Dr. Keelo; and that Dr. Keelo was Plaintiff's primary physician until Plaintiff lost his insurance benefits. Plaintiff testified that, at the time of the hearing, he resided at the Salvation Army's Railton residence, where he had a single unit apartment with a private bathroom; that he received two meals a day which were delivered to him by a "meal[s] on wheels type organization"; that since he had been receiving the meals there had only been one attempt to provide him with diabetic meals; that at the time of the hearing Plaintiff was not being provided with diabetic meals; and that he did not have a choice regarding the type of meals he received. Plaintiff further testified that doctors have recommended that he go on a diet; that at the time of the hearing his

---

[1] Missouri is one of several test states participating in modifications to the disability determination procedures that apply in this case. These modifications include the elimination of the reconsideration step. 20 C.F.R. 404.906, 404.966, 416.1406, 416.1466 (2008). Therefore this case proceeded directly from Plaintiff's initial denial to review by the ALJ.

attempts at dieting included watching his intake of carbohydrates, calorie counting, and not eating too much bread; that he "could do a better job" of counting his calories; that he was permitted to have a refrigerator in his apartment for his medications; that he was not permitted to have "stoves, crock pots, things of that nature" in his apartment; and that his sources of food were the two meals provided to him and the vending machines at the Railton residence. Tr. 26-32, 43-44.

Plaintiff said that he graduated from high school and was educated for two years in heating and refrigeration; that he started working in heating and refrigeration; that after he worked in heating and refrigeration he worked in security; that he worked for Barnes Jewish Hospital ("Barnes") from 1986 to 2003; that his first job at Barnes was as a patient transporter; that he later worked for Barnes in security; that when he worked in security at Barnes his job consisted of "nothing but walking" during an eight hour shift; that he worked at Children's Hospital as an information representative coordinator; and that he was discharged from Barnes in 2003 for misuse of a company phone when he engaged in a personal dispute with someone over the phone. Plaintiff also said that in 2004, for approximately six months, he worked seasonally for the City of St. Louis Parks Department; that his duties for the Parks Department consisted of unlocking and maintaining public restrooms in approximately ten parks; that after working for the Parks Department he then worked for approximately one year at Twin City Security ("TCS"); that TCS posted him as a security guard at an overnight trucking company where he was permitted to sit in his vehicle and observe the grounds and able to periodically exit his car and stretch when he was in pain; that he was unable to continue working at the trucking company because he could not find transportation to work after his vehicle was towed due to unpaid tickets; that he could not afford to recover the vehicle from impound; and that TCS attempted to place Plaintiff in another job but no placement was appropriate for someone

who required the use of a cane. Tr. 29-31.

Plaintiff testified that in 2003 he went to a clinic for treatment; that from March 1, 2003, to February 25, 2004, he did not receive medical treatment at all because he did not have insurance; that at the time of the hearing he did not have a Medicaid card; that while he was working for TCS he received medicine and clinic care from the South County Clinic which charged for medicine and services based on the amount of money he earned; that within the year and a half prior to the hearing he went to St. Louis County Clinic, South County Clinic; that at the time of the hearing he was receiving medicine and medical care from Grace Hill which has a medical services program for the homeless; and that at Grace Hill he was being treated for "my disc in my back, my L15 lumbar spine, my diabetes, my blood clots, my enlarged heart problem that I have and my bronchial, you know, my asthma, my bronchitis." Plaintiff further testified that he went to the emergency room at Forest Park Hospital on February 25, 2005, because he had chest pains and that two months later he returned to the emergency room and was admitted for three days because of his heart. Plaintiff said that at the time of the hearing he was taking blood thinners twice a day; that he had sleep apnea; that he was using a CPAP machine every evening; that the CPAP machine "does great, it does great"; and that he had neuropathy from diabetes. In regard to the neuropathy Plaintiff said it affects his right leg by producing a burning sensation "almost like a hot knife being stuck into your leg. It's, I mean, it's to the point where I have to stop if I'm on concrete, kneel down, somewhere, til the pain kinda eases over some, til I'm able to regain my strength and get up and walk." Tr. 32-35.

Plaintiff testified that he can dress and bathe himself; that it takes him a "period of time" to do so; that his social worker brought him to the hearing; that he has a driver's license; that he is able to drive for three to four miles at a time; that after three or four miles he has to get out and stretch

his right leg; that he can walk "maybe half a block or just a little bit better" without needing a "break"; that if he walks longer than that he experiences shortness of breath and he has to stop walking "because my lower disc in my back, you know, starts to really hurt, starts to really affect me"; and that using a cane he can only stand for five or six minutes because standing any longer results lower disc pain. Tr. 35-36, 38.

In response to the ALJ's asking Plaintiff why he repeatedly stood up during the hearing Plaintiff replied that he kept standing up because his right leg had a burning sensation and that his leg was swollen. Plaintiff testified that he cannot climb a flight of stairs without stopping; that bending and stooping "[h]urts, very painful in the lower back and in my knees"; that he experiences swelling in his feet and ankles; that despite taking medication the swelling "starts up under my knee area"; that the swelling goes from his knees downward; that he has swelling in his lower extremities; that the swelling happens three to four times a week; and that the doctor has told him to keep his legs elevated. Plaintiff also testified that he can lift eight to ten pounds and that if he lifts more than that it affects his back. Tr. 36-38.

Plaintiff testified that he tries to walk around the building where he lives; that "sometimes" he tries to walk around the block; that he was able to see a personal trainer at the YMCA at one point; that at the time of the hearing he was not seeing the trainer because he lost his vehicle; and that a doctor authorized him to attend the YMCA program which required a doctor's referral. Tr. 38-39.

Plaintiff also testified that he takes care of his fish tank, plays the piano located in the lobby of his residence building, and sings in a church choir; that, in church choir, he is unable to stand while singing the songs; that the choir allows him to sit while singing; that he attends Bible study on Tuesdays, choir rehearsal on Saturdays, and church services on Sundays; that the church is located

approximately five miles from his residence; and that sometimes a church member provides him with transportation to the church. Tr. 39-40. Plaintiff also testified that, depending on the amount of pain he was in, a typical day for him consists of his reading his Bible, taking his medication and shots, trying to do a little exercise, bathing, and going to the lobby of his residence to play the piano. Plaintiff stated that his chores at the Railton residence consist of maintaining his room and bathroom. Tr. 39-41.

Plaintiff said that he takes generic prozac to treat stress and depression caused by pain, a failed relationship, and his homelessness; that there are days when he does not want to be alive; that there are days when Plaintiff thinks of hurting himself; that he saw a counselor once but was unable to visit the counselor again because he did not have transportation; and that at the time of the hearing he maintained contact with the counselor by talking on the phone. Tr. 40-41.

Plaintiff testified that the area of his body experiencing the most pain was "from [his] right hip all way down to [his] foot area, just the entire leg"; that the pain was "always there somewhat"; that prescribed medication seemed "like it's okay, but sometimes that doesn't help...they're like 500 milligrams, and I don't wanna take too much of it"; that in rating his pain between zero and ten with zero representing no pain, on a normal day when he did not have any appointments his pain level was at a five or a six; and that after a doctor's appointment his pain would rate between five and seven. Tr. 41-42.

Plaintiff further testified that he did not collect unemployment after the last job he had ended; that he did not apply for unemployment; and that the reason he did not apply for unemployment was because once he obtained transportation his former employer was going to "find [him] another position like the position that [he] had." Tr. 43.

# III.
# MEDICAL RECORDS

Medical records from West County Internal Medicine dated December 6, 2001, reflect that Plaintiff had "DDD" and a herniated lumbar disc; that he walked with a cane; that he claimed to have sleep apnea; that Plaintiff weighed over three hundred pounds; that an accurate reading of Plaintiff's weight could not be taken on the digital scale; that Plaintiff's blood pressure was 128/86; and that he was prescribed xenical for his morbid obesity. Tr. 393-94.

Anthony Massi, M.D., of Barnes-Jewish West County Hospital reported on December 27, 2001, that Plaintiff underwent a sleep apnea test; that the time of the test, Plaintiff's weight was 390 pounds; that test results demonstrated that Plaintiff had severe obstructive sleep apnea; that Plaintiff was placed on a nasal CPAP machine, which normalized the respiratory disturbance index to 2.4 events per hour and eliminated nocturnal desaturation. Tr. 415-17.

Medical records from West County Internal Medicine, dated February 20, 2002, reflect that nutrition was discussed with Plaintiff; that Plaintiff was given a meal plan; that Plaintiff was instructed to decrease his fat intake; and that he was told to increase activity as tolerated. Tr. 392.

Medical records from West County Internal Medicine dated August 15, 2002, reflect that Plaintiff weighed 438 pounds; that Plaintiff had swelling of his third left finger and pain that ran up his left arm into his neck and down into the left side of his chest; and that Plaintiff had tingling in his back and shoulder. Tr. 391.

Medical records from West County Internal Medicine, dated December 23, 2002, reflect that Plaintiff complained that for ten days he felt numbness, tingling, and burning in his left palm to his armpit and then down the left side of his body; that he also experienced neck and chest pain; that his

weight could not be read; that his blood pressure was 148/98 and 145/84; that Plaintiff's left hand had mild weakness; that "[illegible] 50 # wt gain since last year"; that to treat his obesity, Plaintiff was prescribed xenical; that to treat his hypertension ("HTN") Plaintiff was prescribed norvasc; and that it was recommended that Plaintiff have a stress test. Tr. 388.

Medical records from West County Internal Medicine, dated February 11, 2003, reflect that Plaintiff reporting experiencing lower pelvic and scrotal pain and increased leg edema; that Plaintiff stated he weighed 438 pounds; that Plaintiff's blood pressure was 140/100; and that Plaintiff had shortness of breath ("SOB") since the prior Saturday night; that Plaintiff had HTN; and that his lungs were clear. Tr. 387.

Records of Missouri Baptist Medical Center ("Missouri Baptist") reflect that Plaintiff was admitted June 18 through June 25, 2003, and that upon presenting Plaintiff stated that for three days he had experienced increasing pain in his left leg; that while working in security at Barnes-Jewish West County Hospital he noticed that he had trouble pulling his left leg up because it was so swollen; that four years prior he was in a motor vehicle accident where he sustained back and leg injuries; that he had chronic pain in his back and lower legs since the accident; and that he had occasional dyspnea on exertion and a history of chronic obstructive sleep apnea. Records of Missouri Baptist further reflect that Plaintiff had a large left popliteal deep venous thrombosis; that Plaintiff did not drink alcohol; that Plaintiff's blood pressure on June 18, 2003 was 140/70; that Plaintiff's lung exam revealed "scant bibasilar crackles; that his chest exam was normal; that there was no cyanosis, clubbing, or edema in Plaintiff's right leg; and that Plaintiff had "positive Homans in his left leg with tenderness in his left popiteal fossa." Records from Missouri Baptist further reflect that Plaintiff's primary discharge was embolism and thrombosis of the vein and his secondary diagnosis was disease

of the pharynx/nasopharynx, sleep apnea and cardiac dysrhthmia; that Plaintiff was treated with an anticoagulant consisting of coumadin and heparin; that there was no evidence of a pulmonary embolism; that Plaintiff had some episodes of brady arrhythmias which were presumed to be secondary to Plaintiff's sleep apnea; that Plaintiff was treated with continuous positive airway pressure; and that Plaintiff was consulted by a nutritionist. Tr. 424-427.

June 19, 2003 records from Missouri Baptist reflect that a CT was taken of Plaintiff's chest to rule out a pulmonary embolism; that study results were "severely limited due to poor opacification of the pulmonary arteries related to the patient's large body habitus; that there was no gross evidence of large central pulmonary emboli"; that "minimal parenchymal disease in the lingula and superior segment of the left lower lobe probably representing a telectasis/scar" was noted; and that"very tiny pleural effusions versus artifact" were noted. Tr. 433-434.

Records of Missouri Baptist, dated June 20, 2003, reflect that a CT was taken of Plaintiff's abdomen and pelvis to rule out an abdominal or pelvic mass related to his "DVT" or chronic back pain. Test results reflect that there were no masses in Plaintiff's abdomen or pelvis and that the exam was limited by the Plaintiff's obesity. Tr. 435.

June 20, 2003 cardiology consultation notes of Paul Robiolio, M.D., of Missouri Baptist, reflect that Plaintiff was seen because of sinus pauses; that Plaintiff's risk factors included hyperlipidemia, hypertension, and a family history of arteriosclerotic heart disease; that Plaintiff denied being diagnosed with diabetes; that four months prior, Plaintiff had developed left-sided, sharp, atypical chest pains; that Plaintiff's stress test had been negative; that during the prior several months, Plaintiff reported swelling in both legs, with more on the left side than the right; that two to three days before being admitted Plaintiff noticed a knot in his left leg, which led to the diagnosis of

9

a deep venous thrombosis in the left leg; that there was "no gross evidence of large central pulmonary emboli"; that Plaintiff experienced bradycardia, which occurred during his sleep; that Plaintiff had chronic dyspnea on exertion, which he attributed to his obesity and edema; that Plaintiff's obesity and the sedentary nature of Plaintiff's job, which required him to sit for two to three hours at a time, were probably risk factors for his DVT; and that at the time of Dr. Robiolio's examination Plaintiff said he was taking a blood pressure pill, of which he "recently ran out." Dr. Robiolio's report further states that at the time of the examination Plaintiff was working as an information representative at St. Louis Children's hospital, weighed 450 pounds, and had a blood pressure of 120/72, a heart rate of 78, and a respiratory rate of 18. Dr. Robiolio further reported that Plaintiff's heart tones and breath sounds were distant; that Plaintiff's lower extremities revealed "trace pre-tibial edema" and "some tenderness in the posterior popliteal region on the left where the putative DVT is located"; that Plaintiff had "symmetric strength times all four extremities"; and that Plaintiff's cholesterol was 133. Dr. Robiolio also reported that Plaintiff had "sinus pauses in the setting apnea spells"; that Plaintiff did not have a history of intrinsic heart disease; that Plaintiff had "a history of hypertension although his blood pressure is well controlled"; that Plaintiff had a negative work-up for and there were no manifest symptoms of ischemic disease; that Dr. Robiolio considered placement of a pacemaker to treat Plaintiff's sinus pauses; that "on talking to the patient and hearing of his asymptomatic state and the likely association with his apnea spells" the pacemaker was deferred; and that Plaintiff was in favor of a plan to avoid a pacemaker. Dr. Robiolio's plan for Plaintiff included holding off on the pacemaker, seeking a consultation to manage Plaintiff's obstructive sleep apnea, continuing telemetry, and obtaining an "echo, 2-D, and doppler." Tr. 428-430.

July 15, 2003 records from West County Internal Medicine reflect that Plaintiff coumadin

prescription was overdue. Tr. 386.

Medical records from West County Internal Medicine dated July 18, 2003, reflect that Plaintiff weighed 445 pounds; that his blood pressure was 132/86; and that Plaintiff had a history of "COSA" treated by his CPAP machine, DVT treated with coumadin, and a history of HTN. Tr. 384.

July 23, 2003 medical records from West County Internal Medicine reflect that Plaintiff complained of painful swelling and throbbing in his left leg that had started the evening before. Tr. 385.

July 25, 2003 medical records from West County Internal Medicine reflect that Plaintiff was present for a follow-up visit for his DVT; that Plaintiff weighed 440 pounds; that his blood pressure was recorded at 181/88 and 110/92; and that Plaintiff's left foot was swollen. Records of this date are otherwise illegible. Tr. 382.

July 28, 2003 medical records from West County Internal Medicine reflect that Plaintiff complained of severe left toe pain and swelling since the night before and that Plaintiff needed coumadin. Records of this date are otherwise illegible. Tr. 383.

September 2, 2003 medical records from West County Internal Medicine reflect that Plaintiff had been out of coumadin for seven days; that his blood pressure was 122/92; that Plaintiff was present for a follow-up regarding his DVT, HTN, and "OA"; and that Plaintiff was using a CPAP machine. Records of this date are otherwise illegible. Tr. 381.

September 12, 2003 medical records from West County Internal Medicine reflect that staff had unsuccessfully tried "numerous times and ways" to contact Plaintiff to discuss the need for him to continue his coumadin; that Plaintiff's home telephone was disconnected; that Plaintiff's work telephone number was no longer valid because Plaintiff was no longer employed; that Plaintiff's

mother was contacted by telephone and several messages were left; and that a letter was sent to Plaintiff's home and there was no response. Tr. 380.

March 1, 2004 records from the Myrtle Hillard Davis Comprehensive Health Center, Inc., reflect that Plaintiff was there to have both legs checked for blood clots; that Plaintiff was experiencing pain in his left leg; that Plaintiff weighed 471 pounds; and that his blood pressure was 150/94. Records of this date further state that Plaintiff wanted help with dieting and that he was on coumadin. Tr. 376-77.

February 25, 2005 records from Forest Park Hospital reflect that Plaintiff presented to the emergency room complaining of swelling in his bilateral lower extremities; that a venous bilateral extremity scan demonstrated that there was no evidence of right lower extremity deep venous thrombosis; that there was no evidence of thrombosis in the left common femoral vein, superficial femoral vein, popliteal vein and posterior tibial vein; and that there was an absence of venous flow and the thrombus in one of the superficial veins in the popliteal fossa. Emergency room records note that Plaintiff was oriented and alert and that his behavior was appropriate. Tr. 364-73.

March 8, 2005 medical records from Family Medicine of St. Louis reflect that Plaintiff was 6'2" tall and weighed 477.2 pounds; that his temperature was 97.8; that pulse was 92; that blood pressure was 158/90 and 130/80. Records of this date further reflect that Plaintiff reported that he had been seen in the ER two weeks prior; that he had DVT in both legs; that he took coumadin to prevent blood clots; and that he had been taking coumadin on and off. Records of this date are otherwise not legible. Tr. 343.

April 26, 2005 medical records from Family Medicine of St. Louis reflect that Plaintiff was morbidly obese; that he had HTN for which he took medication; that he complained of blurred vision,

pain in side of abdomen, and nausea for past few days; and that Plaintiff's history included DVT for which he was on coumadin therapy, and an abscess of seventh vertebrae at the age of eight years old. Records of April 26, 2005, are otherwise not legible. Tr. 332-37.

Records of Forest Park Hospital, including a discharge summary prepared by Marta Mortensen, M.D., reflect that Plaintiff was admitted to the hospital April 26, 2005; that Plaintiff's admitting diagnoses included uncontrolled diabetes mellitus, hyperglycemic, hyperosmolar state, hypertension, and a history of bilateral DVT; that Plaintiff complained of excessive thirst, excessive urination, increased appetite, loss of weight over the prior few months, headache, and blurred vision; that Plaintiff's blood sugar was under control at discharge; that Plaintiff was placed on a sliding scale of insulin and home medications including coumadin, norvasc, and albuterol; that during his hospital stay Plaintiff's blood sugars were recorded as 564, 555, 419, 488, 445, 384, 369, 328, 269, 210, 189, and 164; that Plaintiff was prescribed a low salt and sugar free diet, coumadin, metformin, glipizide XL, lisinopril, aspirin, and Keflex; that Plaintiff's chest examination was normal; and that x-rays showed a soft tissue mass displacing the trachea to the right of midline, which suggested a thyroid goiter on the left. Records are not clear as to the date Plaintiff was discharged. Tr. 353-62.

May 6, 2005 records from Family Medicine of St. Louis reflect that Plaintiff weighed 452.3 pounds; that his pulse was 92; that his blood pressure was 106/80; that Plaintiff's blood sugars were noted as ranging from 124 at the lowest to 304 at the highest, with an average range at 167-180; that Plaintiff said he had intermittent blurry vision; and that Plaintiff stated that he watched his diet. Records of this date are otherwise not legible. Tr. 331.

Clinic records of Elena Lejano, M.D., of the Saint Louis County Department of Health South County Health Center, reflect that on August 8, 2005, Plaintiff presented for an annual physical

examination; that Plaintiff reported he could no longer afford to see Dr. Klein and that he had been out of most of his medications for two months; that Plaintiff's reported complaints included diabetes, headache, lower back pain, leg pain, blurred vision, swelling, depression, urine problems, and tingling; that Plaintiff's social history included occasional alcohol use consisting of a "12 pack over one mo[nth]" and "walking every morning 2 blocks"; and that Plaintiff's medical history included sleep apnea, diabetes mellitus, diabetic neuropathy, hypertension, phlebitis, substance abuse disorder, recurrent DVT, and intervertebral abscess. Tr. 277-78.

August 8, 2005 clinic records also state that Plaintiff weighed 473 pounds; that he said his pain was ten on a scale of one to ten; that Plaintiff's blood pressure was 137/84; that Plaintiff was alert and oriented; that his gait and voice were normal; that Plaintiff's neck was not tender; that his thyroid was a "[n]ormal size and consistency"; that Plaintiff's chest wall, movements, and breath sounds were normal; that cardiovascular examination showed a normal carotid artery, normal point of maximal impulse, regular rhythm and no murmurs; that Plaintiff's movements, motor, bulk, contour, and gait were normal bilaterally; that Plaintiff's joints and muscles were normal; that Plaintiff had no pain in regard to his spine and had full range of motion in this regard; that Plaintiff's diabetes was uncontrolled and that he needed to restart his medications; that Plaintiff had unspecified essential hypertension and needed to restart medication; that Plaintiff was morbidly obese; that Plaintiff had "polyneuropathy in diabetes"; and that Plaintiff was to make appointments for nutrition, diabetic education, podiatry, and his eyes. Tr. 278-281.

Dr. Lejano reported on September 16, 2005, that Plaintiff was seen for a follow-up visit; that Plaintiff stated he had been following all the doctor's recommendations, used a cane, had pain in his back and legs, was "unable to walk into [the] grocery store from [the] parking lot without resting,"

and had blurred vision; and that Plaintiff's weight was 470 pounds, his pain level was 10/10, his pulse was 97, his respiratory rate was 28, and his blood pressure was 124/69. Notes of this date further state that the doctor was unable to palpate Plaintiff's thyroid gland; that Plaintiff had bilateral swelling in his knees; that Plaintiff was alert and oriented; that Plaintiff had "polyneuropathy in diabetes"; and that Plaintiff's joints, muscles, chest and lung exam, lower extremities, and cardiovascular rhythm were normal. Tr. 272-76.

Records of September 16, 2005 further reflect that Plaintiff's blood sugars were under control; that his blood pressure was under control; that Plaintiff was instructed to continue taking norvasc, lisinopril and aspirin; that Plaintiff's hyperlipidemia had improved because Plaintiff had "made dietary changes"; that the pain in Plaintiff's limb was "likely OA-pt working on wt loss"; that Plaintiff had probable "DM neuropathy"; and that Plaintiff was prescribed amitriptyline HCl to treat his polyneuropathy. Tr. 274-75.

Records of Shilpa Thornton, M.D., of the Saint Louis County Department of Health South County Health Center, reflect that on October 4, 2005, Plaintiff complained of his eyes burning and watering and of his vision being blurred and that Plaintiff's medical history included headache, nausea, weakness, sleep apnea treated with a CPAP, recurrent DVT, hypertension, bilateral blood clots, sleep apnea, obesity, type II diabetes mellitus diagnosed in May 2005, diabetic nephropathy, insulin dependent diabetes mellitus, blurred vision, substance use disorder, and possible "[f]luid overload. Dr. Thornton reported that if Plaintiff's blurred vision was related to his diabetes, there should be "extended ophthalmoscopy, bilateral, initial determination of refractive state." Tr. 270-71.

Dr. Lejano's records of October 20, 2005, reflect that Plaintiff reported that he was experiencing "increased depression... has had a bad week"; that Plaintiff was receiving continued

treatment for his diabetes; that Plaintiff's respiratory system did not demonstrate decreased exercise tolerance; that Plaintiff reported having chest and joint pain and swelling in his extremities; that Plaintiff's weight was 474 pounds and 0.9 ounces, his temperature was 97.5°F, his pulse was 95, his respiratory rate was 32, and his blood pressure was 136/86; that Plaintiff used a cane to assist him in walking; that the doctor was unable to palpate Plaintiff's thyroid gland; that Plaintiff's neck size had increased; that Plaintiff had normal breath sounds and chest movements; that Plaintiff had a regular heart rhythm and normal heart sounds; that Plaintiff's lower extremities "above the sock line" demonstrated bilateral non-pitting edema; that Plaintiff was taken off norvasc for treatment of his hypertension and prescribed Lisinopril; that Plaintiff was instructed to continue his current medicines for treatment of his diabetes mellitus; that Plaintiff was to continue taking warfarin as a long-term anticoagulant; that Plaintiff received an ultrasound of his thyroid on September 20, 2005, which revealed the thyroid's right lobe was longer than the left and that there was a cystic area in the left lobe; that Plaintiff dosage of amitriptyline HCI was increased; that he was taking amitriptyline HCI to treat his polyneuropathy; that Plaintiff was told to reschedule a cardiology appointment for treatment of his chest pain; and that Plaintiff had an appointment with a FMHC coordinator for treatment of depression. Tr. 267-69.

Dr. Lejano's November 29, 2005 records reflect that Plaintiff reported that he was experiencing difficulty breathing with his CPAP at night due to his having a cold; that Plaintiff weighed 481 pounds; that his respiratory rate was 32 and labored; and that his blood pressure was 142/86. Tr. 265.

Dr. Lejano's December 1, 2005 records reflect that Plaintiff reported that he was feeling better; that he was having trouble with his CPAP due to nasal congestion; that he was taking

Warfarin daily; that he had joined the men's choir at church which was "helping with [his] depression"; that he"[s]till [had] burning in legs despite amitriptly"; and that his blood sugars were under control; and that he experienced insomnia. Dr. Lejano's December 1, 2005 records further reflect that Plaintiff's weight was 480 pounds; that his blood pressure was 140/68; that his breath sounds were decreased in both lung fields due to body habitus; that Plaintiff's heart rhythm was regular; that his heart sounds were normal and decreased due to body habitus; that Plaintiff was being treated for diabetes mellitus and hypertension; that Plaintiff had polyneuropathy with burning in legs; that he was prescribed Trazodone HCI; that Plaintiff had a depressive disorder and would be starting counseling; and that Plaintiff was currently on long-term use anticoagulants. Tr. 263-64.

Dr. Lejano's January 12, 2006 records state that Plaintiff stated his legs were swollen and that he reported having burning pain, "SOB" when he walked a block, being "very depressed" about his weight and health, and having "some" dizziness "intermittently" when tried to walk or exercise. Plaintiff also reported on this date that he was unable to stay awake during day; that he was using a CPAP machine; and that his sleep had become worse in the past month. Records of January 12, 2006 also state that Plaintiff experienced a "Decreased Exercise Tolerance and Difficulty Breathing"; that there was swelling in his extremities; that Plaintiff experienced nocturia; and that Plaintiff was depressed and did not exhibit suicidal tendencies; that Plaintiff weighed 491 pounds; that he had a pain level of nine out of ten; that Plaintiff's pulse was 87, his respiratory rate was 20, and his blood pressure was 139/80; that Plaintiff's breath sounds in both lung fields were decreased due to body habitus; that he had normal heart sounds which were distant due his body habitus; and that he had bilateral non-pitting edema in his lower extremities. Tr. 260-261.

Dr. Lejano also noted on January 12, 2006, that Plaintiff had "Fluid Overload," questionable

congestive heart failure, diabetes mellitus and blurred vision; that Plaintiff had a chest X-Ray on April 26, 2005, which showed that Plaintiff a normal chest with "no active infiltr or effusions of lung fields. soft tissue mass displ trachea to right- poss left thyroid goiter"; that Plaintiff had a history of sleep apnea which was treated with a CPAP machine; that he had recurrent DVT since 2003; that Plaintiff had an invertebral abscess from the age of eight which required a bone transplant from his left hip; that Plaintiff was hospitalized in May 2005 for diabetes, hypertension, bilateral leg blood clots and sleep apnea; and that Plaintiff had a history of obesity, diabetes mellitus which was diagnosed in April 2005, diabetic nephropathy, hypertension, phlebitis, and "Substance Use Disorder." Dr. Lejano noted that the "SOB thought to be due to obesity." Tr. 259.

Dr. Lejano's January 12, 2006 records further state that Plaintiff had not started counseling; that he was prescribed Fluoxetine to treat depression; that in regard to Plaintiff's edema, "wt likely contributing"; Plaintiff was prescribed furosemide, potassium chloride, and lisinopril, and a diuretic, to aid in treating his hypertension; that Plaintiff was told to discontinue taking trazodone because it was a possible contributor to his continued hypersomnia with sleep apnea; that Plaintiff was referred to a nutritionist to treat his morbid obesity and encouraged to continue exercise; that Plaintiff's obesity contributed to his depression; that Plaintiff had experienced unspecified chest pain and was referred to a cardiology department in November 2005; that Plaintiff was advised to loose weight; that Plaintiff was on long-term use of anticoagulants for DVT; that Plaintiff was urged to decrease his fluid intake at night to reduce his urinary frequency; and that Plaintiff was prescribed ibuprofen to treat pain in his limb. Tr. 261-262.

Dr. Lejano reported on February 23, 2006, that Plaintiff "joined the YMCA and has a personal coach..goes 3x week x 1 hr each time"; that Plaintiff was "feeling much better since starting

to exercise at the Y"; that he reported that his depression was better since "starting Fluoxetine and counseling"; that Plaintiff's blood sugar was "highest [at] 169. reports fbs 92- occ over 120"; that Plaintiff exhibited shortness of breath and no chest pain; that Plaintiff had normal heart sounds, which were "distant due to body habitus"; that Plaintiff had bilateral non-pitting edema in his lower extremity; that Plaintiff weighed 484 pounds; that he had a pain level of ten out of ten; that he had a pulse of 100 and a respiratory rate of 20; and that his blood pressure was 145/78. Records of February 23, 2006, further reflect that Plaintiff's blood pressure was "still elevated"; that he was told to continue all medicines, including an increased dose of metoprolol tartrate and an increased dose of fluoxetine; that Plaintiff's depression was "doing better"; that he was to continue counseling and the exercise program at the YMCA; that Plaintiff was prescribed potassium chloride and furosemide to treat his edema; that Plaintiff was taking long-term use anticoagulants; that Plaintiff was being treated for diabetes mellitus and hyperlipidemia; and that Plaintiff was given an update referral appointment for treatment of unspecified chest pain. Tr. 257-58.

Records reflect that Plaintiff had a hemoglobin test on February 23, 2006, which showed Plaintiff's his HGA1c was 6.2%. The report of this date states a that a non-diabetic qualification would be less that 6.0%. Tr. 284.

Felicia Brown, M.D., of the Saint Louis County Department of Health South County Health Center, reported on April 3, 2006, that Plaintiff had myalgia or leg pain; that Plaintiff weighed 489 pounds; that Plaintiff's pain level was ten out of ten; that plaintiff's blood pressure was 147/88; that his pulse was 94; that his respiratory rate was 26; that Plaintiff's "[r]ight lower extremity [was] exquisitely tender with palpation," there was "[m]inimal warmth," and [n]o cord palpated"; that Plaintiff had been ordered to take warfarin sodium as a long-term use anticoagulant; that Plaintiff

had been ordered to take Glipizide XL tablets to treat his diabetes mellitus; and that Plaintiff reported pain in his joint involving his lower leg. Dr. Brown's notes of this date state Plaintiff felt that the pain in his right calf felt like his previous blood clots; that Plaintiff was directed to go to the emergency room; and that Plaintiff refused an ambulance and stated that he wanted his brother to take him to the emergency room. Tr. 254-55.

Emergency room records from Forest Park Hospital dated April 3, 2006, reflect that Plaintiff presented complaining of right leg pain, burning, and swelling from his foot to his buttocks and testicle and that Plaintiff said that he had these pains for two weeks; that the pain worsened when he stood; that he had a history of diabetes II, asthma, sleep apnea treated with a CPAP, "7 disc - back," blood clots in his legs, and an enlarged heart; that his last "DVT" was in his left leg two years prior; that he was taking ibuprofen for he leg pain, which did not help; that the pain improved with relaxation; that his pain was 10/10. Records state that examination showed that Plaintiff had erythema in his right leg and edema in his right leg; that Plaintiff weighed 489 pounds; that Plaintiff's pulse was 102; and that blood pressure was 135/86. Records of April 3, 2006, further state that Plaintiff's right leg demonstrated no DVT; that he had mild varicose veins; and that he was instructed to take ibuprofen and darvocet and to keep his leg elevated. Tr. 323-27.

An April 3, 2006 venous uni scan extremity report states that Plaintiff had mild varicosities in the mid-calf region of his right leg; that spontaneous flow, pulsatile flow, augmentation and compressibility were shown in the deep venous system; and that deep venous thrombosis was not seen. Tr. 321.

Emergency room records from DePaul Health Center reflect that on April 10, 2006, Plaintiff presented complaining of right, left and bilateral leg swelling and of pain and tenderness located in

the right and left upper thighs; that Plaintiff stated that the onset of pain was gradual and had started two days previously; that his pain in his left leg was ten out of ten and in his right leg was seven; and that the pain had become worse and was sharp and burning. Records of April 10, 2006, further reflect that Plaintiff's weight was 217.1 kilograms; that his height was 6'2"; that his chest and abdomen were not tender; that his breath sounds were normal; that his left and right calves were tender; that both his legs were tight with edema; that Plaintiff had full range of motion and denied numbness or tingling in both legs; that his sensation was intact; that on a scale of zero to ten Plaintiff rated his level of pain at seven for his right lower extremity and as a ten for his left lower extremity. Tr. 235-46.

An April 10, 2006 diagnostic imaging report from DePaul Health Center reflects that X-rays were taken of Plaintiff's lumbosacral spine because Plaintiff reported leg pain; that "AP" and lateral views of the lumbar spine showed Grade II spondylolisthesis of L5 on S1, which is "usually associated with bilateral spondyloysis; and that the lumbar spine was otherwise negative. Tr. 234.

Clinical Summary and Emergency records from DePaul Health Center reflect that on April 10, 2006, Plaintiff presented complaining of right, left, bilateral leg swelling, pain and tenderness located in the right and left upper thighs; that Plaintiff said that the quality of the pain was sharp and burning; that the pain was associated with decreased use; that the severity of the pain was severe; and that Plaintiff had pain with movement and pain at rest. Records of this date state that Plaintiff's recommended treatment was rest and ice; that the Plaintiff had no history of depression; that Plaintiff was hypertensive and appeared uncomfortable and in pain; that Plaintiff's left and right calves were was tender; that both of his legs were tight with edema; that Plaintiff's primary diagnosis was bilateral sciatica with grade II spondylosis; and that Plaintiff was prescribed Darvocet and Flexeril.

Tr.235-237.

Dr. Lejano's records of April 18, 2006, reflect Plaintiff was seen for a routine check up; that Plaintiff said he was unable to go to the YMCA for exercise program because of leg and back pain; that Plaintiff went to emergency room because he was worried about pain in his legs; that no blood clots were found when he went to the emergency room; that spondyloisthesis in his back was found when he went to the emergency room; that the doctor was unable to get a reading of Plaintiff's weight; that Plaintiff's pulse was 86, his respiratory rate was 22, and his blood pressure was 167/107; that Plaintiff was alert and not anxious, depressed or in acute distress; that Plaintiff was obese and well developed; that his breath sounds were decreased due to body habitus; that Plaintiff had normal heart sounds which were distant due to body habitus; that Plaintiff's lower extremity had bilateral non-pitting edema; that in Plaintiff's spine had no paraspinous muscle spasm; that Plaintiff had no tenderness over thoracic vertebra, lumbar vertebra, sacral vertebra or sacroiliac region; that Plaintiff had sciatica, for which he was prescribed naproxen sodium; and that Plaintiff's previous prescription for ibuprofen was cancelled; that Plaintiff was treated for unspecified essential hypertension, for which he was prescribed metoprolol tartrate and procardia XL; that Plaintiff was treated for diabetes mellitus; that Plaintiff was instructed to continue watching his diet, increasing his exercise, and using his medications; that Plaintiff had a depressive disorder which was doing better with fluoxetine; that Plaintiff was to continue counseling; and that Plaintiff used anticoagulants. Tr. 251-53.

Forest Part Hospital records reflect that on May 23, 2006, Plaintiff was admitted by Lee C. Hanson, M.D., for chest pain and reflux; that Plaintiff also suffered from diabetes mellitus, hypertension, morbid obesity, hyperlipidemia, and obstructive sleep apnea; that Plaintiff stated that

he had experienced chest pains for two days; that Plaintiff said that the pain was sharp and constant with radiation to his left shoulder; that Plaintiff said that the pain was partially relieved at home by taking two Rolaids; that Plaintiff said that the pain subsided after he received three nitroglycerin tablets in the emergency room; that Plaintiff had complained of having a sour taste in his mouth at the time of admission; that Plaintiff's initial blood pressure 165/109 and his heart rate was 97; that Plaintiff reported his pain as ten; that a second reading showed that Plaintiff's blood pressure 160/105 and his heart rate was 95; that Plaintiff was placed on a telemetry for cardiac monitoring; that Plaintiff's cardiac enzymes were followed for three sets to rule out "MI" as a cause of chest pain; that the Plaintiff's cardiac isoenzymes were negative three times; that Plaintiff was prescribed procardia XL, lasix, metoprolol, an ACE inhibitor, lisinopril, and protonix "daily as it was thought [Plaintiff's] chest pain could possibly be secondary to gastroesophageal reflux"; and that on discharge Plaintiff did not have any chest pain, was tolerating a regular diet, and had stable vital signs. Tr. 29-309.

Christina M. Edens, M.D., of Forest Park Hospital, reported on May 23, 2006, that in addition to reporting chest pain, Plaintiff reported increased shortness of breath over the past few weeks; that Plaintiff felt that his throat glands were swollen; that Plaintiff said that at times he felt as if acid or food was regurgitated back into his throat; that Plaintiff weighted 492 pounds at the time of admission; that Plaintiff said that his weight had "increased some over the past several months" and did not know how much it increased; that Plaintiff's blood pressure 140/90, his heart rate was 96 and his respiratory rate was 20; that Plaintiff's lungs were distant and clear to auscultation bilaterally; that Plaintiff had distant heart sounds with "S1-S2 present"; that trace edema was found in Plaintiff's bilateral lower extremities; that Plaintiff's blood pressure was "well

controlled"; that Plaintiff's hyperlipidemia would continue to be treated with lovastatin; that Plaintiff's DVT treatment would continue with warfarin therapy; and that his depression would be treated with fluoxetine. Tr. 304-305.

In a May 23, 2006 chest AP portable projection report, Thomas J. Pilla, M.D., stated that this test showed that Plaintiff had cardiomegaly; that the aorta was atheromatous; that the lung fields were clear; that there was "no definite evidence for pulmonary vascular congestion"; and that there was no change in conditions when compared to an April 26, 2005 study. Tr. 306.

In a May 24, 2006 report from a venous uni scan extremity- right, taken in response to lower extremity edema, Dr. Pilla stated that there was an examination of the right lower extremity by means of a color flow doppler to exclude deep venous thrombosis and that the test showed that "[f]low is spontaneous as well as phasic to veins, and although the veins appeared competent, there was pulsatility. No evidence of deep venous thrombosis was seen." Tr. 307 (emphasis in original) Dr. Pilla's opinion on this date was "negative right lower extremity for deep vein thrombosis" and pulsatile veins "suggesting valve incompetence in the iliac system or congestive heart failure." Tr. 307.

A discharge summary from Forest Park Hospital prepared by Christina M. Edens, M.D., reflects that Plaintiff was discharged May 24, 2006; that Plaintiff was continued on metformin and glipizide daily and put on a sliding scale insulin; that Plaintiff's blood sugar levels were 104, 144, and 142 during admission; that Plaintiff "was seen by Dietary who recommended a carb-consistent cardiac diet for [Plaintiff]"; that Plaintiff said that his blood sugar had been poorly controlled at home; that the poor control of Plaintiff's blood sugar was likely secondary to poor dietary habits; that during admission Plaintiff complained of pain in his right lower extremity; that a doppler of the

right lower extremity was negative for DVT; Plaintiff was instructed to be on a low salt cardiac diabetic diet, to follow up with his primary doctor, Dr. Lejano, to have his CPAP machine settings retested because he had gained seventy-five pounds since beginning the CPAP treatment for his sleep apnea; and that Plaintiff was discharged to home with his condition stable and improved. Tr. 300-301.

A June 19, 2006 letter prepared by Myra Stanley, LPN, MSW, states that she saw Plaintiff as his psychotherapist for one session; that she had met with Plaintiff for brief, unscheduled visits to schedule other appointments when he was at the South County Health Center for other appointments; that "due to transportation problems and many health problems, [Plaintiff] ha[d] not been able to meet with [her] for other appointments"; that Plaintiff reported symptoms of depression including insomnia, lack of motivation, and "feeling depressed" because he cannot sit or stand for long periods of time; that Plaintiff reported feeling anxious about his lack of proper medical care and proper nutrition for weight management; that Ms. Stanley discussed with Plaintiff the benefit of psychiatric medication management; that Plaintiff agreed to seek psychiatric care for management of depression; and that lack of transportation to a psychiatric facility had interfered with Plaintiff's continuity of mental health care. Tr. 249.

# IV.
# DECISION OF THE ALJ

After considering the evidence of record, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. The ALJ found that Plaintiff met the disability insured status requirements of the Social Security Act through December 31, 2009, and that Plaintiff had not

worked at the substantial gainful activity level since the amended alleged onset date of February 25, 2005. Tr. 16.

The ALJ further found that Plaintiff had a severe impairment based on the following combination of severe impairments: morbid obesity, diabetes mellitus, hypertension, a history of deep venous thrombosis, sleep apnea, spondylolisthesis/sciatica, cardiomegaly, and depression. Tr. 16. The ALJ found, however, that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1. Tr. 17.

In regard to Plaintiff's diabetes mellitus, the ALJ found that he did not meet or medically equal any listed impairment because he did not have neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements or gait or station; or acidosis at least on average of once every two months documented by appropriate blood chemical tests; or retinitis proliferans to the extent required by Listing 2.02, 2.03, or 2.04. In regard to Plaintiff's hypertension, ALJ found that Plaintiff's hypertension did not meet or medically equal a listed impairment because Plaintiff's hypertension did not require evaluation under Listing 4.04 for congestive heart failure or ischemic heart disease or under criteria for the affected body system. In particular, the ALJ found that Plaintiff did not have congestive heart failure, ischemic heart disease or any affected body system, and did not have any of those impairments at the Listing level of severity. The ALJ further found that Plaintiff did not meet or medically equal a Listing for a spinal impairment because there was no evidence that Plaintiff experienced nerve root compression in a neuro-anatomic distribution with motor, sensory or reflex loss, or spinal arachnoditis confirmed by operative note or pathology report

or lumbar spinal stenosis resulting in pseudocladication. In regard to Plaintiff's depression, the ALJ also found that Plaintiff's depression was no more than a mild mental impairment to his social functioning, activities of daily living and concentration, persistence, or pace; that Plaintiff did not meet the requirements of Listing 12.04B for depression; and that Plaintiff did not meet the burden of proof to establish he satisfied the alternative requirements of Listing 12.04C. Further, the ALJ concluded that obesity is not a listed impairment and that Plaintiff's obesity did not, by itself or in combination with other impairments, medically equal any Listing section. Tr. 17.

The ALJ further found that the evidence failed to show that Plaintiff had a mental impairment that has resulted in more than a mild restriction of activities of daily living, maintaining social functioning, concentrating, persistence or pace, or episodes of decompensation each of extended duration. The ALJ concluded that under the circumstances, plaintiff's mental impairment was not severe and that it would not significantly limit Plaintiff's ability to perform basic work activities. Tr. 19.

The ALJ concluded that Plaintiff's impairments could reasonably be expected to cause symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms was "not entirely credible." Tr. 18. The ALJ concluded that, although Plaintiff cannot engage in strenuous work or prolonged standing or walking, he can engage in work that permits sitting most of the work day, occasionally standing and walking, or lifting and carrying ten pounds; that Plaintiff is capable of performing his past relevant work as an information clerk as it is generally performed in the national economy; and that, therefore, Plaintiff is not under a disability as defined by the Act. Tr. 20-21.

**V.**

## STANDARD OF REVIEW

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)). Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual functional capacity and the physical and mental

demands of the work the claimant has done in the past. 20 C.F.R. §§ 404.1520(f). Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) ("[W]e may not reverse

merely because substantial evidence exists for the opposite decision"); Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994);  Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

It is not the job of the district court to re-weigh the evidence or review the factual record de novo.  McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Instead, the district court must simply determine  whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).  Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence").  Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted).  See also Eichelberger,  390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ.& Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the

plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 841(8th Cir. 1992); Ricketts v. Sec'y of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990); Jeffery v. Sec'y of Health & Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b-e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Id. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Nevland, 204 F.3d at 857.

## VI.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is

substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm his decision as long as there is substantial evidence in favor of the Commissioner's position. Krogmeier, 294 F.3d at 1022.

Plaintiff contends that the ALJ erred for several reasons including that ALJ's decision regarding his residual functional capacity ("RFC") is not supported by substantial evidence. The Regulations define RFC as "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). See also Anderson v. Shalala, 51 F.3d, 779 (8th Cir. 1995). To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir.2000) (per curiam ), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir.2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a

professional." Id.  See also Eichelberger, 390 F.3d at 591.

RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996).  Additionally, "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis."  Id.  Moreover, "[i]t is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain."  Id.

"RFC is an issue only at steps four and five of the sequential evaluation process." Id. at *3. As stated above, at step 4 the claimant has the burden of persuasion  to demonstrate his or her RFC. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).  "If a claimant establishes [his or] her inability to do past relevant work, then the burden of proof shifts to the Commissioner."  Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir.2005) (citing Eichelberger, 390 F.3d at 591). In contrast to the first four steps of the sequential evaluation where the claimant carries the burden of proof, the Commissioner has the burden of production at step 5.  Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004). At step five "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner."  Goff, 421 F.3d at 790. Also, at step five, where a claimant's RFC is expressed in terms of exertional categories, it must be determined whether the claimant can do the full range of work at a given exertional level.  The claimant must be able to "perform substantially all of the exertional and nonexertional functions

required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." Id.

The Eighth Circuit has recently held in Eichelberger, 390 F.3d at 591, as follows:

> A disability claimant has the burden to establish her RFC. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. Id. We have held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001). "[S]ome medical evidence" must support the determination of the claimant's RFC, Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

Upon making an RFC assessment an ALJ must first identify a claimant's functional limitations or restrictions and then assess his or her work-related abilities on a function-by-function basis. See Masterson, 363 F.3d at 737; Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004). Pursuant to this requirement, the ALJ in the matter before the court considered Plaintiff's symptoms to the extent they were consistent with the objective medical evidence as well as other evidence of record. The ALJ concluded that Plaintiff's credible symptoms and combined impairments preclude his engaging in strenuous work or prolonged standing or walking. The ALJ further found, however, that Plaintiff's credible symptoms and combined impairments do not preclude his engaging in work that permits sitting most of the work day while occasionally standing and walking and that Plaintiff's non-severe depression does not limit his ability to work. The ALJ further found that Plaintiff's functional limitations included lifting no more than ten pounds. After considering the requirements of his past relevant work as an information clerk the ALJ concluded that Plaintiff can perform this work.

Upon reaching his conclusion the ALJ noted that obesity is not a listed impairment and that by itself does not meet the requirements of any Listing. The ALJ further made the statement that "pursuant to the requirements of Social Security Ruling 02-01p, [he] carefully considered whether [Plaintiff's] obesity by itself or in combination with his other impairments medically equaled any Listing section." Tr. 17. The ALJ concluded that it did not. As stated above, however, RFC is a "medical question." Lauer, 245 F.3d at 704. In Plaintiff's case there is no medical evidence which addresses Plaintiff's ability to function in the workplace nor is there any evidence from a health care professional regarding the effect of Plaintiff's morbid obesity on his ability to engage in any substantial gainful employment. Indeed, SSR 02-01p stresses that adjudicators are reminded "that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately" and that they are to consider the effects of obesity "when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity." 2000 WL 628049 at *1 (S.S.A. Sept. 12, 2002).

There can be no question that Plaintiff, at approximately 480 pounds, is morbidly obese and that his obesity is characterized as severe. Significantly, SSR 02-1p states that "[i]f an individual has the medically determinable impairment obesity that is 'severe' ... we may find that the obesity medically equals a listing." This Ruling further explains that a finding of medical equivalence may be made under certain circumstances such as where "obesity is of such a level that it results in an inability to ambulate effectively." Id. at *5. SSR 02-1p also states that:

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. As explained in SSR 96-8p ("Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims"), our RFC assessments must consider

> an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

2000 WL 628049 at *6.

In Plaintiff's case no assessment consistent with the requirements of SSR 02-1P has been made.

For the reasons discussed above, the court finds that the ALJ's conclusion that Plaintiff is not disabled is not supported by substantial evidence on the record as a whole. Considering the incompleteness of the record discussed above, the court further finds that the record is insufficiently developed. The court will, therefore, reverse this matter and remand it to the ALJ so that the record can be fully developed in accordance with this decision. Upon remand the ALJ should seek the opinion of a consulting or treating physician to obtain that doctor's opinion regarding the effects of Plaintiff's obesity on his ability to engage in substantial gainful employment on a regular and continuing basis as well as his ability to perform routine movement and physical activity as would be required in the work environment. Upon obtaining the opinion of a physician the ALJ should be mindful that examination and/or testing of Plaintiff may be necessary.

## VII.
## CONCLUSION

The court finds that this matter should be reversed and remanded to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4. Upon remand, the ALJ should be directed to fully develop the record in a manner consistent with this court's opinion. The court stresses that upon reversing and remanding this matter it does not mean to imply that the Commission should return a finding of "disabled." The court is merely concerned that the

Commissioner's final determination, as it presently stands, is not fully developed concerning Plaintiff's allegation that he unable to work. As such, it cannot be said that the record is supported by substantial evidence in this regard.

Accordingly,

**IT IS HEREBY ORDERED** that the relief which Plaintiff seeks in Complaint is **GRANTED**, in part, and **DENIED**, in part; Doc. 1

**IT IS FURTHER ORDERED** that a Judgment of Reversal and Remand is entered contemporaneously herewith remanding this case to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4.

**IT IS FURTHER ORDERED** that upon entry of the Judgment, the appeal period will begin which determines the thirty (30) day period in which a timely application for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, may be filed.

/s/ Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of July, 2008.